**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

MAYELA MALDONADO-RODRIGUEZ, ET AL,

     Plaintiffs,

        v.                            CIV. NO. 10-1362 (PG)

ST. LUKE'S MEMORIAL HOSPITAL, INC.,
ET AL,

     Defendants.

### OPINION AND ORDER

    Pending before the Court is co-defendant St. Luke's Memorial Hospital, Inc. motion for summary judgment (Docket No. 65). For the reasons set forth below, the Court **GRANTS** the co-defendant's motion.

### I. BACKGROUND

    On April 30, 2010, plaintiffs Mayela Maldonado-Rodriguez, Jorge Perez-Lugo, Jorge M. Perez-Maldonado, and Marieli Maldonado (hereinafter collectively referred to as "Plaintiffs") filed the above-captioned claim against defendants St. Luke's Memorial Hospital, Inc., d/b/a Hospital Episcopal San Lucas ("HESL" or "the Hospital" or "the Defendant"), Dr. Jaime A. Reyes-Cardona[1] ("Dr. Reyes"), Dr. Hector Javier Acosta-Tapia ("Dr. Acosta") and Sindicato de Aseguradores de Imperica Medica ("SIMED") and other unknown defendants for the failure to screen, treat, stabilize and transfer patient Christian Perez-Maldonado ("the Patient") in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Included in the complaint is also a supplemental cause of action for medical malpractice pursuant to Article 1802 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 5141 ("Article 1802").

    Plaintiffs allege that on May 3, 2009, at approximately 1:21p.m., the Patient suffered serious injuries when the All Terrain Vehicle ("ATV") he was operating in Ponce, Puerto Rico collided with an SUV. See Docket No. 15 at ¶ 24. The paramedics that arrived at the scene of the accident took the Patient to HESL. See id. at ¶¶ 30, 34. Dr. Acosta and Dr. Reyes were both

---

[1] The court entered partial judgment dismissing all claims against Dr. Reyes and SIMED in its capacity as insurer for this party on March 21st, 2011. See Docket No. 39.

emergency room doctors at the Hospital at the time the Patient was admitted. See Amended Complaint, Docket No. 15.  The Plaintiffs allege that the Hospital lacked the necessary staff and medical equipment to treat the Patient's injuries, and violated EMTALA in their treatment and failure to properly transfer him to a trauma center. See id. at ¶¶ 45-46. The Plaintiffs also allege that the Hospital and its staff and doctors incurred in medical malpractice resulting in the Patient's death. See Amended Complaint, Docket No. 15. The Patient was declared dead at 6:02p.m., id. at ¶ 78, a little over four hours after the accident.

It is uncontested that the Hospital is subject to the provisions of EMTALA, see Docket No. 65-1, however, it now moves the court to dismiss the Plaintiffs' EMTALA claims with prejudice and their state law medical malpractice claims without prejudice. See Docket No. 65. The Hospital contends that it complied with its obligations to screen, treat, attempt to stabilize, and transfer the Patient to a trauma center in accordance with the statute. Therefore, this claim, which gives rise to federal jurisdiction, should be dismissed. See id. In light of the Plaintiffs' failure to timely file a response, the court already ruled that this motion shall be deemed unopposed. See Docket No. 77.

## II. STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is

both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III. FINDINGS OF FACT

Before setting forth the facts found by this Court to be undisputed and relevant to the matter at hand, we must first address several compliance issues noted by the Court when reviewing the Hospital's statements of facts and supporting evidence.

"Documents supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir.2000) (citing FED.R.CIV.P. Rule 56(e)). To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). See 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2722 (3d ed.1998). "Under Federal Rule of Civil Procedure 56(e), on summary judgment, the parties in their supporting affidavits shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 14 (1st Cir.2006). "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Id. "The failure to

authenticate a document properly precludes its consideration on a motion for summary judgment." Robinson v. Bodoff, 355 F. Supp. 2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits).

Moreover, a party must not "[overlook] the crucial point that documents do not automatically become a part of the record simply because they are the products of discovery." Hoffman, 439 F.3d at 15. "If a party wishes the court to consider matters disclosed during discovery, he must take appropriate steps to have them included in the record: merely citing to pages of discovery materials not of record does not suffice." Id.

After a careful review of the record, we find that some of the materials submitted by the Hospital are inadmissible for the purposes of summary judgment because an exhibit attached in support of its statements of fact lacks an authenticating affidavit or fails to indicate whether they stem from discovery materials on file. To wit, the Hospital attached the Patient's medical records (Docket No. 65-2) without an authenticating affidavit and must be thus disregarded.[2] As a result, the Court did not consider the proposed factual statements that were not properly supported by the record on file.

As per the foregoing discussion, the Court found the following relevant facts were undisputed and supported by the record citations:

1.  Hospital is subject to the provisions of the EMTALA.

2.  On May 3, 2009, at approximately 1:21pm, the Patient suffered serious injuries when the All Terrain Vehicle ("ATV") he was operating in Ponce, Puerto Rico collided at an intersection with an SUV driven by a resident of the Commonwealth of Puerto Rico.

3.  Ambulance personnel arrived at the scene of the accident at approximately 1:48pm, at which time, paramedics found the Patient prone on the ground complaining of pain in his legs.

4.  The Patient arrived at HESL at 2:09 p.m., according to the ambulance record, 48 minutes after the call to the ambulance dispatch.

5.  Upon arrival, the Patient was attended by Dr. Acosta, HESL's board certified emergency room doctor.

---

[2] Moreover, part of the medical record is in the Spanish language in contravention with the First Circuit's ruling in Puerto Ricans For Puerto Rico Party v. Dalmau, 544 F.3d 58 (1st Cir.2008) (holding defendants were required to provide certified English language translation of documents). Specifically, a document titled "Forma para Transferencia de Pacientes" is part of the medical record attached and, because it is not in the English language, the court cannot consider the same.

6.    Dr. Acosta found that the Patient had suffered acute trauma and had a serious medical condition. See Docket No. 65-5 at page 78.

7.    The HESL nurse staff, Dr. Acosta and Dr. Liv Cuyar, a medical resident, performed the Patient's medical assessment, ordered and administered several medications and ordered and performed tests and laboratories, including X-Rays. See Docket No. 65-5 at pages 146-178.

8.    Dr. Acosta stabilized the Patient's pelvis.

9.    The Patient was given blood transfusions.

10.   Dr. Acosta ordered and authorized the Patient's transfer to Centro Medico (trauma center) even when he was unstable because the benefits outweighed the potential risk of the transfer. See Docket No. 65-5 at pages 210-211.

11.   Due to the Patient's condition, arrangements were made to transfer him to Centro Medico, the trauma center in San Juan. See Docket No 65-1 ¶ 11; Docket No. 65-7 at pages 48-49.

12.   Dr. Jones from Centro Medico accepted the transfer.

13.   Aeromed was contacted to transfer the Patient by air to Centro Medico. See Docket No. 65-5 at pages 190-191; Docket No. 65-6 at page 50.

14.   Plaintiff Mayela Maldonado, the Patient's mother, authorized the transfer. See Docket No. 52 at page 52.

15.   The Patient died before the transfer could take place.

### IV. DISCUSSION

**A. EMTALA Claims**

"Congress enacted EMTALA in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with emergency conditions but no medical insurance. … EMTALA therefore "is a limited anti-dumping statute, not a federal malpractice statute."" Ramos-Cruz v. Centro Medico del Turabo 642 F.3d 17, 18 (1st Cir.2011) (citing Reynolds v. MaineGeneral Health, 218 F.3d 78, 83 (1st Cir.2000)). "To this end, EMTALA imposes duties on covered facilities to: (a) provide an "appropriate medical screening examination" for those who come to an emergency room seeking treatment, and (b) provide, in certain situations, "such further medical examination and such treatment as may be required to stabilize the medical condition."" Alvarez-Torres v. Ryder Memorial Hosp., Inc., 582 F.3d 47, 51 (1st Cir.2009) (citing 42 U.S.C.

§ 1395dd(a), (b)(1)(A); <u>López-Soto v. Hawayek</u>, 175 F.3d 170, 172-73 (1st Cir.1999)). To establish an EMTALA violation, a plaintiff must show that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

<u>Correa v. Hospital San Francisco</u>, 69 F.3d 1184, 1190 (1st Cir.1995) (internal citations omitted). In the case at hand, the first and second elements are not at issue. That is, the Patient arrived at the emergency room of the Hospital, a participating EMTALA facility, seeking medical care. The Plaintiffs' claims turn on the third prong.

**1. Duty to Screen**

In the complaint, the Plaintiffs allege, in essence, that the Hospital failed to provide the Patient with the immediate, prompt, appropriate and necessary medical screening that was required under EMTALA in light of his medical condition. <u>See</u> Docket No. 15, ¶¶ 3, 93. According to the Plaintiffs, the physical examination the Patient received "was at best cursory … ." <u>Id.</u> at ¶ 52.[3] The Defendant requests that this claim be dismissed. <u>See</u> Docket No. 65.

With regards to a participating hospital's medical screening requirement under EMTALA, subsection (a) of the statute establishes that:

> In the case of a hospital that has a hospital emergency department, if any individual … comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for **an appropriate medical screening** examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, **to determine whether or not an emergency medical condition … exists.**

42 U.S.C.A. § 1395dd(a). "EMTALA does not define the term "appropriate medical screening examination." However, it does indicate that the purpose of the

---

[3] However, pursuant to the Plaintiffs' own allegations in the complaint, the Patient's heart rate and blood pressure were taken, <u>id.</u> at ¶¶ 49-50; x-rays were performed which revealed fractures, <u>id.</u> at ¶ 53; the hospital staff, at the request of Dr. Acosta, tested the Patient's arterial blood gases to determine if he was perfusing properly and to determine whether or not he was developing acidosis, <u>id.</u> at ¶ 54; blood transfusions were ordered and performed, <u>id.</u> at ¶ 68; and, the Patient was intubated, <u>id.</u> at ¶ 75, all prior to his death.

screening is to identify an "emergency medical condition."" del Carmen
Guadalupe v. Negron Agosto, 299 F.3d 15, 19 (1st Cir.2002). The statute
defines the term "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute
> symptoms of sufficient severity (including severe pain)
> such that the absence of immediate medical attention
> could reasonably be expected to result in--
> > (i) placing the health of the individual
> > (or, with respect to a pregnant woman, the
> > health of the woman or her unborn child) in
> > serious jeopardy,
> > (ii)   serious    impairment    to    bodily
> > functions, or
> > (iii) serious dysfunction of any bodily
> > organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).

It is an uncontested fact that Dr. Acosta, the emergency medicine
specialist that first attended to the Patient, ordered and performed a series
of tests, and found that the Patient had suffered acute trauma and was in a
serious medical condition. See Statements of Fact #6-7. If the statute imposes
a duty to screen upon participating hospitals just so that a determination can
be made as to whether or not an emergency medical condition exists, and here,
the fact that the emergency room physician made that determination is not in
question, it follows then that the Hospital complied with its duty to screen
the Patient as per the language of the statute. In other words, a strict
reading of the statute forces this court to conclude that the Hospital
complied with its duty to screen under EMTALA inasmuch as the emergency room
doctor admits to have identified that the Patient was in fact suffering from
an emergency medical condition.

"Moreover, whereas malpractice liability usually attaches when a health
care provider fails to adhere to a "general professional standard" of care,
… , EMTALA only requires an appropriate medical screening examination within
the capability of the hospital's emergency department." del Carmen Guadalupe,
299 F.3d at 21 (internal citation and quotation marks omitted). "A claim of
inappropriate medical screening based on a failure to provide certain
diagnostic tests must at least address whether the hospital was capable of
performing such tests." Id. at 22. Although in the complaint the Plaintiffs
criticize the Hospital for failing to provide the Patient with the appropriate
and necessary medical screening and treatment, see Docket No. 15 at ¶ 93,
Plaintiffs have offered no evidence indicating that the tests and treatment
that the Patient needed were in fact within the Hospital's capability.

Therefore, summary judgment dismissing the Plaintiffs' claims that the Hospital failed to fulfill the medical screening requirement under EMTALA is appropriate for more than one reason in this case.[4]

### 2. Duty to Stabilize

In their complaint, the Plaintiffs allege that the Hospital failed to stabilize the Patient in light of the serious medical condition he arrived in. See Docket No. 15 at ¶¶ 102-106. The Defendant now seeks to have this claim dismissed. See Docket No. 65.

"As a corollary to the right to be appropriately screened, EMTALA guarantees patients the right, if an emergency medical condition is determined to exist, to have that condition stabilized before discharge or transfer to another hospital." Reynolds v. MaineGeneral Health, 218 F.3d 78, 84 (1st Cir.2000). To that effect, the statute provides, in relevant part, that:

> If any individual … comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> (B) for transfer of the individual to another medical facility … .

42 U.S.C. § 1395dd(b)(1). Therefore, "the duty to stabilize is only triggered when it has been determined that the patient is suffering from an emergency

---

[4] The court also notes that the Plaintiffs fail to properly allege a cause of action under subsection (a) of EMTALA. "A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir.1995) (internal citations omitted). "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." Id.

In the complaint, the Plaintiffs categorize the screening as faulty and untimely. See Docket No. 15. However, they do not allege either one of the two scenarios for which EMTALA provides a cause of action under Section 1395dd(a), to wit, that the Hospital refused to screen the Patient or that the screening that the Hospital provided was inconsistent with regular screening procedures for similarly-situated patients. See Vazquez-Rivera v. Hospital Episcopal San Lucas, Inc., 620 F.Supp.2d 264, 269 (D.P.R. 2009) (citing Correa, 69 F.3d at 1192-93). "EMTALA does not create a cause of action for medical malpractice," Correa, 69 F.3d at 1192, and thus, "faulty screening, … as opposed to disparate screening or refusing to screen at all, does not contravene the statute," id. at 1192-1193 (emphasis ours). Because the Plaintiffs do not allege, or submit any evidence for that matter, that the Patient was denied screening or received different treatment than other patients perceived to have the same medical condition, they fail to properly set forth a claim under EMTALA that the Hospital failed to fulfill its medical screening requirement. See del Carmen Guadalupe, 299 F.3d at 22 (affirming summary judgment of EMTALA's duty to screen violation claim inasmuch as plaintiffs failed to raise a genuine question of material fact on the issue of differential treatment by submitting no testimony regarding the baseline of care which the hospital provides).

medical condition." <u>Vazquez-Rivera</u>, 620 F.Supp.2d at 269. Here, there is no question that the Patient was in fact suffering from an emergency medical condition.

Now, EMTALA defines the term "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur *during the transfer of the individual from a facility* … ." 42 U.S.C. § 1395dd(e)(3)(A)(emphasis ours). Therefore, "[t]he duty to stabilize under EMTALA "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient."" <u>Alvarez-Torres v. Ryder Memorial Hosp., Inc.</u>, 582 F.3d 47, 51 (1st Cir.2009) (<u>citing</u> <u>Fraticelli-Torres v. Hosp. Hermanos</u>, 300 Fed.Appx. 1, 4 (1st Cir.2008) (unpublished)). Thus, the First Circuit Court of Appeals in <u>Alvarez-Torres</u> reasoned that, taking into account EMTALA's definition of the term "to stabilize," "a hospital cannot violate the duty to stabilize unless it transfers a patient … ." <u>Alvarez-Torres</u>, 582 F.3d at 51-52 (<u>citing</u> <u>Correa</u>, 69 F.3d at 1190 (to establish a violation of the duty to stabilize, the plaintiff must prove, inter alia, that the hospital "bade farewell" to the patient)). According to the First Circuit, this interpretation is consistent with EMTALA's anti-dumping purpose. <u>See</u> <u>Alvarez-Torres</u>, 582 F.3d at 52 ("Interpreting the stabilization provision to apply where transfer occurs is therefore fully consistent with EMTALA's statutory purpose.").

Much like in <u>Alvarez-Torres</u>, "[i]n this case, [the hospital] did not violate the stabilization provision because [the patient] was never transferred." <u>Alvarez-Torres</u>, 582 F.3d at 52. It stems from the uncontested facts of this case that the Patient never left the Hospital's facility and in fact, died in the Hospital hours after being admitted, but before Aeromed could perform the transfer. <u>See</u> *Statements of Fact* #13, 15. Because no transfer occurred, the Plaintiffs are simply unable to establish a stabilization claim under EMTALA, and thus, this cause of action must also be dismissed.

### 3. Duty to Transfer

In the complaint, the Plaintiffs allege a cause of action under EMTALA against the Hospital for failure to transfer the Patient. According to the Plaintiffs, the Hospital "failed to timely transfer [the Patient] and this was

a substantial contributing cause and proximate cause of his untimely death … ." Docket No. 15 at ¶ 112.

The statute defines "transfer" as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital." 42 U.S.C. § 1395dd(e)(4). Pursuant to EMTALA, if a patient's medical condition has not been stabilized, "the hospital may not transfer a patient to another medical facility unless (1) the patient or her proxy requests a transfer in writing, or (2) a physician or other medical professional certifies that the medical benefits available at the other facility outweigh the risks of transfer." Fraticelli-Torres, 300 Fed.Appx. at 5 n. 2 (1st Cir.2008) (citing Baker v. Adventist Health, Inc., 260 F.3d 987, 993 (9th Cir.2001)). Now, "EMTALA merely restricts the conditions under which a hospital may transfer an unstabilized critical patient. …  A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA anti-dumping violation." Fraticelli-Torres, 300 Fed.Appx. at 7.

As a result, whether or not the decision and the arrangements to transfer the Patient were prompt and timely does not give rise to an EMTALA claim as alleged by the Plaintiffs. Therefore, this court is forced to grant the Defendant's request for the dismissal of the Plaintiffs' claim under EMTALA against the Hospital for its alleged failure to comply with its duty to transfer the Patient.

**B. Supplemental Claims**

Since the federal claims have been dismissed against the appearing defendant, namely, the Hospital, and no other grounds for jurisdiction exists, the court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining state-law medical malpractice claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating "if the federal claims are dismissed before trial, … the state law claims should be dismissed as well."). Accordingly, the Plaintiffs' claims brought pursuant to Commonwealth law are hereby **DISMISSED WITHOUT PREJUDICE.**

CIV. NO. 10-1362 (PG)                                                    Page 11

## V. CONCLUSION

For the reasons stated above, this Court hereby **GRANTS** the Hospital's motion for summary judgment (Docket No. 65). The claims pursuant to EMTALA are hereby **DISMISSED WITH PREJUDICE** and the remaining state-law claims are **DISMISSED WITHOUT PREJUDICE.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, April 22, 2013.


S/ JUAN M. PEREZ-GIMENEZ
JUAN M. PEREZ-GIMENEZ
SENIOR U.S. DISTRICT JUDGE